**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **FIRST PLACE, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 25-CV-31-JFJ** |
| v. | ) | |
| | ) | |
| **OTIS ELEVATOR COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**OPINION AND ORDER**

Before the Court is Defendant Otis Elevator Company's Motion for Sanctions (ECF No. 56), which requests a dismissal sanction under Federal of Civil Procedure Rule 37(b)(2)(A). The Court held an evidentiary hearing on January 27, 2026, at which the parties submitted exhibits and presented argument. For reasons explained below, the Court GRANTS Defendant's motion and orders dismissal with prejudice of Plaintiff's claims.

**I.      Factual Record**

**A.      Claims at Issue**

Plaintiff First Place, LLC ("First Place"), filed a Petition against Defendant Otis Elevator Company ("Otis") in Tulsa County District Court on December 19, 2024, alleging breach of contract, gross negligence, actual fraud, and other claims against Otis for failures related to Otis' maintenance of First Place's elevators at First Place Tower. ECF No. 2-1 ("Petition"). The agreement between the parties commenced on September 1, 2017, with a term of ten years ending in August 2027. Ex. A to Petition (Agreement). On April 29, 2024, with approximately three years remaining in the agreement's term, First Place's counsel sent a letter to Otis terminating the agreement due to Otis' "pervasive and continuing material breaches of the Otis Maintenance Agreement since at least October of 2023," which "constitute[d] a threat to public safety." Ex. B

to Petition (letter to Otis).  Otis removed the case to this Court on January 17, 2025, ECF No. 2 (Notice of Removal), and filed a counterclaim against First Place for breach of contract, ECF No. 13 (Amended Answer and Counterclaim).  Otis alleges First Place breached their agreement by failing to give Otis a 90-day opportunity to cure any material failures in performance.  *Id.* ¶¶ 10-11.

**B.      First Place's Representations in Petition Regarding Report**

The Petition alleges that "the state inspector" examined the 15 elevators at First Place Tower in the first week of April 2024, finding numerous state code violations.  Pet. ¶ 50-51.[1]   In support of these allegations, First Place cites "Exhibit F," which is a 14-page document that is headed with "Elevator Safety Inspection Services, Inc." and contact information on each page; titled "Elevator Inspection Report" on each page; and signed by "Mark S White" ("White") on the bottom of each page.  Ex. F. to Petition (Elevator Safety Inspection report signed by White).

First Place further alleges that, "[a]fter this state inspection [by White]," First Place "hired an independent third party to inspect all fifteen (15) elevators on April 11, 2024."  *Id.* ¶ 53.  First Place alleges that the "independent third party" prepared an "Inspection Report," which noted "thirty-three (33) categorical code deficiencies and maintenance failures on the elevators."  *Id.*  In support of this allegation, First Place cites "Exhibit D," which is a 55-page document attached to the Petition.  Ex. D to Petition ("Report").  The Report, as attached to the Petition, is titled "Independent 3rd Party Report, Inspection Date 4.11.2024" on its cover page, is unsigned, and includes no author's name or other indicators of origin.  The Petition describes in significant detail the elevator maintenance issues identified in the Report, which First Place attributes to Otis'

---

[1] Although the Petition alleges this inspection occurred in "April 2023" (Pet. ¶ 50), the report cited in this paragraph is dated April 2024 (Ex. F to Petition).  The Court infers that the 2023 date was a typographical error.

negligent maintenance services. *See* Pet. ¶¶ 53-58, 60-67, 70-71, 73, 84, 129. First Place's conduct in relation to the Report is the subject of the Motion for Sanctions.

### C.      First Place's Representations in Discovery Regarding Report

In discovery, First Place produced the same version of the Report to Otis, which was titled "Independent 3rd Party Report" and had no author identified on its face. Def. Ex. 1 (Bates-numbered copy of Report (FP0005253-FP0005307) in same form as attached to Petition).[2] On May 8, 2025, in its expert disclosures, First Place first identified the Report's author as White, owner of Elevator Safety Inspection Services, Inc, who was also the "state inspector" who signed Exhibit F attached to the Petition. Def. Ex. 4 (First Place's Disclosures of Non-Retained Expert Mark White). First Place identified White as a non-retained expert, with knowledge of Otis' "failure to maintain and negligent maintenance of elevators, along with the authenticity of state elevator inspection reports, extensive compilations of Code violations from the Oklahoma Department of Labor, *and an April 11, 2024 report which Mr. White created.*" *Id.* at 1 (emphasis added).

The expert disclosure states that White's testimony would be "based upon the annual safety inspections which he performed on First Place's elevators on April 5 and 8, 2024," which were "regularly scheduled, paid for by First Place, LLC, and required by the Oklahoma Administrative Code and Elevator Safety Act." *Id.* The disclosure then states that White "*conducted a follow-up inspection of First Place's elevator units on April 11, 2024, . . . after his annual inspections showed there were pervasive safety concerns and Code violations.*" *Id.* at 2 (emphasis added). The

---

[2] Both parties submitted exhibit notebooks at the hearing, which largely consisted of the briefing exhibits. First Place's exhibit notebooks included some additional exhibits that were not attached to the briefs. The Court cites Otis' exhibit notebook as "Def. Ex. __," and First Place's exhibit notebook as Pl. Ex. __."

disclosure states that White and his company "then produced an April 11, 2024 'Report,' which is attached to First Place's Petition as Exhibit 'D.'"  The disclosure states, "[t]hat report both summarizes and sets forth the factual bases in support of Mr. White's testimony, including the photographs taken and components and physical areas inspected on April 11, 2024." *Id.*  Contrary to implications in the Petition, this disclosure represented that the state inspector and the "third party" referenced on the face of the Report were the same person – namely, White.

During their depositions, First Place's representatives confirmed that White prepared the Report.  Specifically, First Place's 30(b)(6) corporate representative, Jacqueline Price, testified on July 1, 2025, that White wrote the Report.  Def. Ex. D (Jacqueline Price July 1, 2025, deposition) at 149:6-10.  When asked why White prepared the Report, Ms. Price testified it was "[b]ecause he performs our state reports, *and then we asked him to elaborate on it when we saw the deficiencies.*" *Id.* at 149:11-14 (emphasis added).

On July 3, 2025, Dee Randall, vice-president of property management at Price Family Properties, testified initially that Quest Elevator Company, not White, had created the Report.  Def. Ex. E (Dee Randall July 3, 2025, deposition) at 71:1-20.  However, later in the deposition, after a break to speak with First Place's counsel, Ms. Randall changed her testimony.  After the break, Ms. Randall testified that she believed "[t]he elevator safety inspector, Mark White," had written the Report.  *Id.* at 108:14-16.  Ms. Randall testified she was not directly involved with commissioning the Report.  *Id.* at 108:17-19.  She testified that she initially thought it was Mike Long from Quest Elevator Company who prepared the Report, but then she realized that, based on the date of the Report, "it had to be Mark." *Id* at 109:1-10.  Ms. Randall further testified that, reading through the Report, she found it reported on "the same exact things that are in Mark's

safety report." *Id.* at 109:10-14.  Ms. Randall did not know why an invoice from White had not been produced, because she "didn't request this report." *Id.* at 109:18-21.

> **D.     White's Deposition, First Place's Corrections, and Further Discovery After Misrepresentations Were Revealed**

Otis deposed White on July 21, 2025.  When White was shown the Report, he testified he had never seen it before and had "no idea" who wrote it.  Def. Ex. 7 (Mark White July 21, 2025, deposition) at 8:14-24.  White testified he had not previously spoken to First Place's counsel.  *Id.* at 9:20-25.  White testified that the Report appeared to be drafted by a consultant, who "totally goes over the whole unit," whereas White is a safety inspector, who is looking for "certain things" to write up when he examines elevators.  *Id.* at 2:6-19.

On July 24, 2025, following this testimony from White, First Place first produced a different version of the Report.  This new version revealed that (1) Otis' direct competitor, American Elevator Company ("AE"), was the true author of the Report, and (2) the version of the Report attached to the Petition, produced in discovery, and referred to in the expert disclosures had been altered in material ways to conceal the true author's name.  *See* Def. Ex. A (cover letter from First Place's counsel dated July 24, 2025, attaching original Report and cover letter from Steven Schmidt, President of AE, to Dee Randall); Def. Ex. 8 (Cameron Jones deposition) at 13:12-14 (describing AE as a competitor of Otis).  In the unaltered Report, the cover page is completely different, titled "American Elevator Technical Assesment [sic]," with AE's logo in large letters and a photograph of First Place Tower.  Def. Ex. A at 4 (unaltered Report cover page).  In addition, almost every page of the 55-page document has a header at the top of the page stating, "American Elevator Technical Assesment [sic]." *Id.* at 5-58.  In the altered version, all AE headers had been removed, and the cover page was replaced by a newly drafted cover page stating "Independent 3rd Party Report, Inspection Date 4.11.2024."  Ex. D to Petition.  First Place also withdrew the

Disclosure of Non-Retained Expert for Mark White, which included the false statement that White authored the Report.  Def. Ex. G (letter to counsel dated July 24, 2025).

Otis filed a motion for extension of scheduling order deadlines, arguing that "material misrepresentations" by First Place and its counsel necessitated further time for discovery and an extension of the scheduling order.  ECF No. 23.  In response, First Place argued it had simply made a "mistake" regarding the author of the Report, and that it "*lost its cover sheet* under which [the Report] was submitted."  ECF No. 24 at 1-2 (emphasis added).[3]  First Place argued that the "*manufactured dispute concerning the mistake of the Report's author should have little, if any bearing upon such extension.*"  *Id.* at 3 (emphasis added).  The Court granted Otis' request for a sixty-day extension of all deadlines.  ECF No. 27.[4]

Pursuant to a subpoena Otis issued to AE after White's deposition, AE first produced an email exchange chain between Steven Schmidt at AE, Dee Randall, and Robert Gary, First Place's chief engineer.  Def. Ex. 11 (email chain).  In these emails, dated April 16, 2024, Mr. Schmidt thanked Ms. Randall for allowing AE to visit First Place Tower, and he attached a pdf version of the Report to the emails sent to Ms. Randall and Mr. Gary.  *Id.*  On September 5, 2025, First Place produced additional relevant emails, which indicated Ms. Randall circulated the original AE Report to Jacqueline Price and Stuart Price on April 18, 2024.  Def. Ex. 10 (email chain) at 3.  This email chain indicates Ms. Randall also attached White's elevator inspection report to the email.  *Id.*  These emails offer a clear path to discerning that White did not author the Report and

---

[3] As explained below, First Place now admits someone at First Place intentionally altered the cover page, along with most of the other pages of the 55-page report.  No evidence suggests First Place simply "lost" the cover page and replaced it with a new one.

[4] During this extension granted by the Court, Otis uncovered that First Place witnesses allegedly could not remember or explain the alteration.  Otis also uncovered that First Place was in possession of unproduced emails revealing the true author.  It is now clear Otis did not "manufacture" a dispute but instead legitimately desired to explore a serious litigation issue.

identifying the correct author of the Report as AE.  These emails were not produced in discovery prior to White's deposition.

Otis then re-deposed Dee Randall and Jacqueline Price as First Place's 30(b)(6) corporate representative.[5]  At her second deposition, Ms. Randall testified that AE had asked to look at First Place's equipment and offer a service proposal, and Ms. Randall had agreed, to have "something we can look at and talk about for future."  Def. Ex. 2 (Dee Randall Oct. 29, 2025, deposition) at 30:24-31:7.  Ms. Randall testified that, "once [AE's] report came in and it was in the condition it was in, that brought a lot of things to our attention that we were not necessarily aware of."  *Id.* at 31:8-10.  Ms. Randall testified she did not know how the cover page and headers of the Report had been altered to remove AE's name, and she did not recall doing it herself, although that "doesn't mean I didn't do it."  *Id.* at 39:20-40:10.  Ms. Randall testified that, if she had done the alterations, it "would be because I didn't want [AE's] name on that report."  *Id.* at 40:13-18.  Ms. Randall testified she knew how to alter a pdf document in that manner, she had done so before on other documents, and she would have done any such alterations of the Report "based on instruction."  *Id.* at 50:18-13.  Ms. Randall did not recall if Stuart Price, Jacqueline Price, or counsel for First Place had instructed her to make the alterations to the Report.  *Id.* at 61:14-23.

In her second deposition, Jacqueline Price testified that she did not instruct anyone to remove the AE authorship from the Report, and she did not know whether anyone had instructed Ms. Randall to do so.  Def. Ex. 3 (Jacqueline Price Oct. 29, 2025, deposition) at 15:16-16:4.  Ms. Price testified that she initially believed White had written the Report, either because someone told

---

[5] First Place submitted errata sheets to Dee Randall's and Jacqueline Price's first depositions, to reflect changed testimony regarding the authorship of the Report from "Mark White" or "Quest" to "American Elevator."  ECF Nos. 56-13 (Jacqueline Price errata sheet), 56-14 (Dee Randall errata sheet). Otis filed a Motion to Strike Errata Sheets (ECF No. 47), arguing First Place's attempt to change Ms. Price and Ms. Randall's substantive deposition testimony is improper.

her that White had written it or because she assumed White had written it because the Report arrived soon after White's state inspection. *Id.* at 9:2-17.

Otis also deposed First Place Tower's chief engineer, Robert Gary, and Stuart Price, owner of First Place Tower. In his deposition, Mr. Gary testified that he had no knowledge of the altered Report before counsel emailed it to him, and he did not know why anyone at First Place would remove AE's name from the Report. Def. Ex. 15 (Robert Gary Nov. 12, 2025, deposition) at 35:10-19, 63:22-25. Mr. Gary testified that White's actual inspection reports are "in a very different format than the American Elevator report," and he did not know how or why anyone would confuse the Report with a report from White. *Id.* at 64:5-24. Stuart Price testified that he had no knowledge of why the Report was altered, that he did not instruct anyone to remove AE's name from the Report, and that he did not know if anyone at First Place instructed someone to do so. Def. Ex. 16 (Stuart Price Nov. 12, 2025, deposition) at 45:25-46:18. In sum, First Place's relevant employees gave no explanation, or even speculation, on the record for how, when, why, or by whom the Report was altered, except that Ms. Randall testified the obvious purpose of the alterations would have been to conceal AE as the true author.

In response to an interrogatory from First Place, Otis stated that its counsel spoke with White by telephone on July 3, 2026, prior to his deposition. Pl. Ex. 10 (Otis' Response to First Place's Interrogatory No. 13) at 1. During the call, White stated he "had no memory of drafting the Third-Party Inspection Report as it was described to him over the phone." *Id.* Otis' counsel spoke with White again the following week, and White again stated he did not recall drafting the Report. *Id.* Otis stated that it did not conclusively know that White was not the Report's author until his deposition on July 21, 2025. *Id.* at 1-2. Otis' counsel did not disclose these calls to First Place's counsel in advance of White's deposition.

### E.    First Place's Counsel's Explanations and Exhibits at Hearing

At the hearing, First Place's counsel argued that the attorneys had no involvement in the alteration of the Report, did not know the Report had been altered until July 2025, and listed White as the author based solely on information from their client.[6]  First Place did not offer any further evidence from its employees regarding how or why the Report was altered, how or why the Report was submitted to counsel in an altered format, or how or why the Report's authorship was affirmatively misrepresented by First Place throughout the litigation.

First Place did present certain exhibits, in conjunction with oral argument, seeking to establish the Report was likely altered in April 2024 for a legitimate purpose.  First Place submitted a letter from its counsel to opposing counsel stating that it received a hard copy of the altered Report on April 25, 2024, *see* Def. Ex. 17 (letter from First Place's counsel to Otis' counsel dated Nov. 18, 2025) at 1, which was prior to First Place's counsel sending Otis the termination letter on April 29, 2024.[7]  First Place also submitted an exhibit showing a meeting likely occurred between First Place and Otis on April 16, 2024.  *See* Pl. Ex. 3 (internal Otis email dated Apr. 15, 2024, discussing "meeting tomorrow" regarding First Place Tower).  Although not pointed out by counsel, this meeting occurred on the same day AE sent the unaltered version of the Report to Ms. Randall.  *See* Def. Ex. 10 (email dated Apr. 16, 2024, from AE to Dee Randall, attaching Report).  Upon inquiry, counsel speculated that First Place may have altered the Report in preparation for

---

[6] Neither Otis nor First Place attempts to attribute any intentional or bad-faith conduct to First Place's counsel.

[7] The altered Report was not attached to the termination letter sent April 29, 2024. No witness provided sworn testimony regarding when First Place first provided its counsel with the altered Report.  In short, the only evidence supporting the date of alteration as April 2024, is an unsworn statement in a letter from First Place's counsel to opposing counsel.

the meeting with Otis, although counsel denied the Report was used at the meeting. *See* ECF No. 80 (transcript of Jan. 27, 2026, hearing) at 32-33. First Place's counsel alternatively speculated that the Report may have been altered to protect the Otis mechanic who had serviced First Place's elevators at First Place Tower, Chris Oliver. *Id.* at 65, 92-93.

First Place's counsel also urged that, following the "innocent" alteration, all knowledgeable individuals forgot about the Report's correct origin between the time of alteration and filing the Petition. Counsel suggested the Report then, during litigation, somehow became "confused" with White's actual safety inspection report. *See id.* at 67-68, 80-81. *See also* Def. Ex. 3 (Jacqueline Price Oct. 29, 2025, deposition), at 9:15-17 (testifying that the Report "came right after [White's] inspection, so . . . I could have just made an assumption" that White authored it). When questioned about the revealing emails circulated among Dee Randall, Jacqueline Price, Stuart Price, and Robert Gary that turned up within weeks after White's deposition, First Place's counsel speculated that it was a mere "oversight" that they were not previously discovered or produced in discovery. *Id.* at 84-85.

## II.    Analysis

In the motion for sanctions, Otis requests dismissal with prejudice of First Place's claims.[8] Otis argues dismissal is the only adequate sanction for First Place's bad-faith litigation conduct consisting of (1) intentionally and willfully falsifying the Report to hide its authorship, attaching the falsified Report to the Petition, and producing the falsified Report in discovery, and (2) repeatedly misrepresenting the Report's author as White, both in litigation documents and depositions. ECF No. 56 at 16. In support of sanctions, Otis further argues that First Place

---

[8] During the hearing, Otis' counsel was not prepared to state whether it would proceed with its counterclaim if First Place's claims were dismissed.

possessed emails revealing the Report's author as AE, yet failed to produce these emails in the normal course of discovery. *Id.* at 4.

First Place now concedes that one of its employees intentionally altered the Report; that it caused counsel to produce the altered Report as a pleading attachment and in discovery; that it repeatedly misrepresented the Report's author; and that it failed to timely produce emails revealing the true author. As its defense to sanctions, First Place argues the Report was altered for an innocent purpose several months prior to litigation, and that its subsequent litigation conduct was the result of mistake, confusion, or negligence. In addition to arguing lack of bad faith, First Place seeks to minimize the importance of the falsified evidence, arguing that the alterations were merely technical, the Report is not a critical document, and Otis suffered no meaningful prejudice. First Place also blames Otis for not discovering the correct author, accusing Otis of "[knowing] American Elevator created the Report the day on which [First Place] filed suit" and knowing "well in advance of" White's deposition that White did not create the Report. ECF No. 65 at 6. First Place requests a lesser sanction than dismissal, such as exclusion of the Report from consideration at summary judgment or trial.

Federal Rule of Civil Procedure 37(b)(2)(A) permits a court to order sanctions where a party fails to obey an order to provide or permit discovery. Such sanctions may include "dismissing the action or proceeding in whole or in part." Fed. R. Civ. P. 37(b)(2)(A)(v). *See Archibeque v. Atchison, Topeka and Santa Fe Ry. Co.*, 70 F.3d 1172, 1174 (10th Cir. 1995) (dismissing claims as sanction where plaintiff withheld information about her prior injuries that would have weakened her claim for damages, stating, "[o]ur case law makes it clear that a district judge may dismiss an action for discovery violations") (citing *Ehrenhaus v. Reynolds*, 965 F.2d 916, 920 (10th Cir. 1992); Fed. R. Civ. P. 37(b)(2)(C) (former version of Fed. R. Civ. P.

11

37(b)(2)(A)).  Courts may also rely on their inherent equitable powers to sanction parties that engage in abusive litigation practices, such as falsification of discovery documents.  *See Garcia v. Berkshire Life Ins. Co. of America*, 569 F.3d 1174, 1179 (10th Cir. 2009) (affirming dismissal of plaintiff's claims as sanction for abusive litigation practices, including fabrication and falsification of discovery documents, pursuant to court's "inherent equitable powers").  "Because of the harshness of dismissal, however, due process requires that the discovery violation be predicated upon willfulness, bad faith, or some fault of petitioner rather than inability to comply."  *Archibeque*, 70 F.3d at 1174 (citation modified).

Before imposing the sanction of dismissal under Rule 37(b)(2)(A) or the Court's inherent equitable powers,

> a court should ordinarily consider a number of factors, including: (1) the degree of actual prejudice to the [movant]; (2) the amount of interference with the judicial process; (3) the culpability of the litigant; (4) whether the court warned the party in advance that dismissal of the action would be a likely sanction for noncompliance; and (5) the efficacy of lesser sanctions.

*Ehrenhaus*, 965 F.2d at 921 (citation modified).  Although this list of factors is not exclusive and does not establish a "rigid test," a court should evaluate these factors on the record.  *Id.*  Dismissal is an appropriate sanction "[o]nly when the aggravating factors outweigh the judicial system's strong predisposition to resolve cases on their merits."  *Id*.

### A.    Culpability of First Place

The abusive litigation conduct warranting dismissal must be predicated upon "willfulness, bad faith, or some fault" of the party, "rather than inability to comply."  *Archibeque*, 70 F.3d at 1174 (citation modified).  As the moving party, Otis bears the burden to demonstrate First Place's culpability by clear and convincing evidence.  *See Xyngular v. Schenkel*, 890 F.3d 868, 873-74 (10th Cir. 2018).

12

### 1.    First Place's Pattern of Conduct Surrounding the Report Indicates Intentional and Bad-Faith Conduct

The Court has carefully examined the totality of circumstances and evidence presented. The Court finds, by clear and convincing evidence, that First Place engaged in a pattern of litigation conduct surrounding the Report that was predicated upon willfulness, bad-faith, and an extreme degree of recklessness and fault.

#### a.    Alteration of the Report

The Court makes the following findings regarding alteration of the Report, which was attached to the Petition and relied on by First Place in litigation.  A First Place employee intentionally altered the Report to conceal the Report's author.  Specifically, the employee edited the original pdf document at some time prior to litigation by removing the Report's cover page, replacing it with a newly created cover page, and removing the "American Elevator" header from nearly each page of the 55-page pdf document.  Even after being given multiple opportunities to do so, First Place never identified who made the alterations, when they were made, or why First Place desired to "legitimately" conceal the Report's author.  Dee Randall testified she knew how to make those alterations and may have done so but would have done so under instruction.  Ms. Randall testified that the alterations would have been done for the purpose of hiding AE's name on the Report.  Emails possessed by First Place, which were produced only after the true author was uncovered, revealed that four people at First Place (Dee Randall, Jacqueline Price, Stuart Price, and Robert Gary) received the original, unaltered Report.  Yet no First Place employee admitted to having instructed Ms. Randall to make the alterations or offered any explanation (or even speculation) of a legitimate purpose for "scrubbing" AE's name from the Report.  AE is a direct competitor of Otis, and the service contract upon which First Place sued still had over three years remaining in its term.  With a competitor as the author, the Report is less persuasive and

supports Otis' counterclaim that First Place was speaking to competitors and planning to breach the contract.  Otis therefore established: (1) an intentional alteration of a key litigation document attached to the Petition, (2) a motive to hide the true author that would give First Place a litigation advantage, and (3) the absence of sworn testimony explaining the timing or true purpose of the alteration.

In response, First Place submitted unsupported explanations that the Court does not find credible.  First Place initially stated in briefs that the Report's cover sheet was lost, without attempting to explain how the replacement cover sheet came to be.  That explanation was set aside once it became clear the alterations to the cover page and document were intentional.  At the hearing, First Place's counsel speculated that the Report was altered in April 2024 for one of two possible legitimate purposes. Under one potential theory, First Place asks the Court to accept that it received the Report from AE, altered the Report, and met with Otis all on the same date, April 16, 2024, but then did not reference the Report during the meeting.  This theory is not plausible or credible, particularly without supporting testimony from First Place employees.  The other theory regarding First Place's desire to protect a former Otis mechanic, Chris Oliver, was not well-developed and has no support in the record.[9]

As to the timing of alteration, First Place offered a letter drafted by its attorneys informing opposing counsel that they received a hard copy of the altered Report on April 25, 2024.  This

---

[9] In briefing, First Place claims "it is both reasonable and likely that the removal of [AE's] name was spurred by a desire to protect Mr. Oliver from unnecessary scrutiny since he left for [AE] at roughly the same time plaintiff received the reports from Mr. White informing it of numerous violations concerning its elevators."  ECF No. 65 at 10 n.2.  At the hearing, First Place's counsel offered speculation that Mr. Oliver recommended that AE survey First Place's elevators and prepare the Report.  First Place presented no evidence in support of this theory, and it seems illogical that First Place would want to protect the mechanic it accuses of fraudulent reporting and shoddy maintenance work.

14

letter, with no accompanying sworn testimony from First Place or its counsel, is not persuasive evidence of the alteration date. Further, even assuming the Court accepts that the Report was altered in April 2024, First Place's counsel has never claimed any knowledge of the alteration prior to July 2025. The implication, therefore, is that First Place provided a materially altered document to its lawyers, without informing its lawyers of the alteration, four days prior to instructing its lawyers to terminate the Otis service agreement. First Place then failed to inform its lawyers of the alteration prior to filing suit against Otis over this same service agreement. In this scenario, First Place's dishonest conduct with its own counsel later snowballed into bad-faith litigation conduct. First Place's culpability remains high, even in its own narrative. Further, as explained in more detail below, the Court does not find it credible that First Place simply "forgot" about the alteration by the time of filing the Petition due to general "corporate confusion" or any other legitimate explanation. These shifting, speculative, and unsupported explanations do not support a finding of good faith.

The Court concludes the Report relied on by First Place during litigation was altered intentionally for a bad-faith litigation purpose – namely, to conceal the Report's author from Otis, so that Otis would remain unaware during litigation that First Place was having conversations with a direct competitor of Otis prior to terminating their contract.

### b. Misattribution of Report to White

The Court makes the following findings regarding the misattribution to White, which was made in expert disclosures and deposition testimony. First Place has never provided consistent explanations in pleadings for how White supposedly prepared the Report. In the Petition, First Place alleged it "hired" an "independent third party" to inspect its elevators after White performed his safety inspection, which implies the Report's author was someone other than White. In its

Disclosures of Non-Retained Expert, however, First Place posited White "conducted a follow-up inspection" after he found safety concerns in the first safety inspection, despite the different formats of the reports.  These shifting explanations indicate First Place was not providing its lawyers with consistent or reliable information regarding the Report.

Otis submitted evidence demonstrating First Place's bad faith in making the misattribution to White.  As First Place has itself pointed out, there were multiple "red flags" that White did not author the Report.  White was a state safety inspector who could not have been "hired" by First Place to consult on elevator maintenance.  Moreover, White signed his own inspection report on each page, while the altered Report had no signature and no attribution except to an "Independent 3rd Party."  It is unclear how anyone at First Place would legitimately think the Report was prepared by White or his company, even though the reports were prepared close in time.  Indeed, Ms. Randall thought Quest, a different competitor to Otis, had prepared the Report until she was apparently informed otherwise during a break in her first deposition.  After the misattribution was revealed, Mr. Gary testified that, because of the distinctly different formatting, he did not know how anyone would confuse the Report with White's actual reports.  Ms. Price admitted at her second deposition that, if someone did not tell her so, she may have may have simply assumed White authored the Report based on its date.

In addition to the "red flags, it is undisputed that First Place was in possession of emails that revealed the true author of the Report.  Such emails were requested but not produced in the normal course of discovery.  They were produced only after White's deposition.  Those emails revealed that (1) White's inspection report and the AE Report were two entirely different documents, and (2) AE authored the Report, which would implicate First Place as having altered the Report to conceal AE's authorship.  The emails circulating the original Report went to four

16

custodians at First Place – Jacqueline Price, Dee Randall, Stuart Price, and Robert Gary – and they are dated in April 2024, the same month First Place terminated its contract with Otis.  The email chain, revealingly titled "FPT Elevator Reports," is among Ms. Randall, Ms. Price, and Mr. Price. It refers to AE, Otis, elevator reports, "Safety Report from Mark," and Otis "not holding up their end of the agreement."  Def. Ex. 10.  These emails were dated during time frames First Place should have been searching, went to relevant custodians, and contained all the search terms one would expect First Place to use, and yet were not discovered.

In response, First Place urges that all misattributions were "innocent" or "negligent" mistakes by someone at First Place.  Again, the Court is confronted with strong evidence of bad faith and virtual silence on the record as to any good-faith explanations, except that First Place must have "assumed" it was White because the reports were close in time.  White's report and AE's report being "confused" with each other is simply not reasonable, in light of the differences in the two reports and the readily accessible email evidence differentiating the two reports. Further, First Place offered no credible explanation for why the relevant emails were not discovered or produced in discovery.[10]  The evidence indicates First Place either discovered but intentionally withheld these emails to conceal the true author or failed to conduct a reasonable search, resulting in its deliberate ignorance of the true author.[11]

---

[10] At the hearing, First Place's counsel emphasized that, when First Place initially searched for relevant emails, they "were looking for emails involving Mark White and Quest Elevator and it wasn't until the disclosure that it was not Mr. White, it was American, did we search the emails and we disclose those emails." ECF No. 80 at 85.  This explanation is particularly unconvincing, given that one of the missing emails from Ms. Randall to Stuart and Jacqueline Price, titled "FPT Elevator Reports," reads, "Elevator Reports for review.  I added the Safety Report from Mark, so this is all the current elevator reports."  Def. Ex. 10 at 3.  Even if First Place focused exclusively on emails involving Mark White's reports, this email chain would have been easily discovered.

[11] Otis did not clearly move for discovery sanctions on this separate ground of failing to produce emails, and the Court is not basing sanctions on this specific discovery violation.  Nonetheless, the

Considering all circumstances – namely, the original bad-faith alteration of the Report, the inconsistent explanations in pleadings regarding the Report, the indications White did not author the Report, the readily available but unproduced emails revealing the true author, and the lack of any explanation on the record from First Place witnesses – the Court concludes that First Place engaged in bad-faith conduct in attributing the Report to White.  At a minimum, First Place engaged in reckless and sanctionable litigation conduct in misidentifying White as the author to its counsel, despite clear emails and other indications of the true author.  First Place then caused counsel to pass along this false representation in an expert disclosure, along with a completely false, and yet very specific, description of White conducting a "follow up" inspection.  First Place then offered binding Rule 30(b)(6) corporate testimony that White authored the Report, which was either intentional or made without conducting the most basic investigation and instead simply "assuming" or blindly accepting White authored the Report.  Whether the misattribution was an intentional lie, deliberate ignorance, or extreme recklessness, it amounts to bad-faith, unreasonable litigation conduct that misled the opposing party and the Court for an extensive time during litigation and multiplied the proceedings.  *See Xyngular Corp. v. Schenkel*, 200 F. Supp. 3d 1273, 1301-02 (D. Utah 2016) (explaining that, for purposes of culpability, "bad faith" does not require "actual ill will" but rather conduct showing "intentional or reckless disregard of the rules," including "substantial and prejudicial obduracy" or "conduct that delays or disrupts the litigation"; while "fault" concerns "the reasonableness of the conduct – or lack thereof – which eventually

---

conduct is relevant to culpability for the misattribution of the Report and to the overall pattern of bad faith.

18

culminated in the violation") (quotations omitted), *aff'd sub nom. Xyngular v. Schenkel,* 890 F.3d 868 (10th Cir. 2018).[12]

### 2.    First Place's Other Arguments Regarding Its Good Faith Are Not Convincing

At the hearing, First Place's counsel suggested that, because First Place is a corporation with a number of individuals with varying knowledge of the relevant facts, it was unsurprising that "somehow things get bollixed up and sort of discombobulated as it works through the chain." ECF No. 80 at 80. This is not convincing. Someone at First Place altered the Report to hide its origin, misrepresented its origin during litigation, and withheld or failed to search for revealing electronic evidence. There are four key employees from First Place that were potentially involved in the original alteration of the Report. They each received the report in emails titled "First Place Elevator Report" or "FPT Elevator Reports" eight months prior to litigation, leaving an easy trail to discern the true author.[13] Even after the truth came out, First Place still did not offer any sworn testimony explaining or speculating as to the alleged "legitimate" origin of the alteration, or all the ensuing "confusion." The Court does not find "corporate confusion" or a simple "corporate mix up" to be a persuasive or credible explanation for First Place's pattern of conduct in this case.

First Place also highlights its good-faith action once it was revealed that White did not prepare the Report, by correcting the record and making witnesses available for deposition. The Court acknowledges that, once White denied writing the Report under oath, First Place admitted

---

[12] The Court acknowledges the foolishness of intentionally misattributing the altered Report to White, because the truth inevitably would be exposed. However, the Court declines to rule in favor of First Place on the issue of culpability simply because this action appears foolish, particularly in light of the overall pattern of bad-faith conduct. Further, the Court finds First Place's misattribution, even if not intentional, was so reckless as to constitute bad faith.

[13] As admitted by counsel during the hearing, First Place does not contend Otis deposed the wrong individuals about the original alteration or that someone else might know what happened.

19

it had altered and misrepresented evidence, and its lawyers took corrective measures. However, First Place has never credibly or consistently explained its conduct. First Place claims not to know or remember what happened. The universal denials of any memory surrounding the alteration are not credible or accepted by the Court. First Place likewise has no credible explanation for its misattributions of the Report's author to White, particularly in light of its access to relevant emails concerning the Report. Such evasive and inconsistent answers are not consistent with good faith. *See Garcia*, 569 F.3d at 1181 (affirming culpability finding where plaintiff had falsified or fabricated multiple discovery documents for self-serving purposes in the litigation, then gave "evasive, inconsistent answers" for making the fabrications); *Archibeque*, 70 F.3d at 1173-74 (affirming culpability finding where plaintiff withheld complete information about prior injuries that would have weakened her damages claim, provided false answers about prior injuries in her deposition, and then attributed the concealment and perjury to mere "oversight" without attempting to explain her conduct).

First Place further attempts to diminish the significance of the alterations to the Report as either "immaterial" or technically accurate, because the only "edits" were to remove the name of the author from most pages of the Report and to replace the cover page with a "generic but otherwise accurate cover page." ECF No. 65 at 8-9. This argument is not compelling. As explained in more detail below with regard to the "prejudice" factor, First Place stood to gain a litigation or negotiation advantage if it concealed that it was considering bids in April 2024 from Otis' competitors or asking Otis' competition to evaluate Otis' work. While First Place did not alter the "substance" of the Report related to the reported elevator maintenance issues, the Court rejects First Place's attempt to diminish its fault in manipulating the Report.

20

In sum, the Court finds by clear and convincing evidence that First Place engaged in a pattern of bad-faith litigation conduct regarding the Report, that such conduct was not for a legitimate purpose, and that such conduct did not result from mistake, confusion, or negligence. The culpability factor weighs heavily in favor of dismissal.

### B.    Actual Prejudice to Otis

Otis alleges three types of prejudice resulting from First Place's conduct. The last two are persuasive and weigh in favor of dismissal.

#### 1.    Time and Effort

Otis argues it had to spend significant additional time and effort in seeking to uncover who altered the Report and why. This is not the type of prejudice warranting dismissal. The Court granted Otis a 60-day extension of the scheduling deadlines to conduct any additional desired discovery related to the Report, its alteration, and the related misrepresentations. Had Otis requested any further discovery or extensions, the Court likely would have granted any reasonable requests to mitigate any discovery-related prejudice. This type of alleged prejudice, although it exists, is not so significant as to weigh in favor of dismissal.

#### 2.    Trustworthiness of First Place's Litigation Conduct

Otis argues all of First Place's evidence must now be viewed through a skeptical lens, because First Place has demonstrated a willingness to put forth false documents and deposition testimony, as well as a willingness to conceal electronic evidence that would have revealed the Report's true origin. "The submission of falsified evidence substantially prejudices an opposing party by casting doubt on the veracity of all of the culpable party's submissions throughout the litigation." *Garcia*, 569 F.3d at 1180. There is no doubt that First Place altered the Report to obscure its origin, that First Place made repeated misrepresentations about the Report's origin in

litigation, and that First Place failed to produce relevant evidence in discovery that would have revealed its true origin. First Place offered no credible, innocent explanation for this conduct. As explained above in Part II.A, the Court finds the pattern of behavior indicates intentional and bad-faith conduct, rather than mistake or confusion. The Court therefore agrees with Otis that First Place's trustworthiness to produce accurate and complete evidence in this case is now diminished. *See Garcia*, 569 F.3d at 1179 (affirming district court finding on prejudice of "absolutely no confidence" that plaintiff "would not attempt to offer additional false evidence at a trial" following repeated fabrications, falsifications, and false testimony). This type of prejudice is difficult for the Court to mitigate. *See id.* at 1181 ("A party's willingness to fabricate evidence bears on character and credibility, which often is broadly at issue in a given case.").

Next, First Place seeks to shift blame to Otis for not uncovering First Place's misrepresentations sooner. Somewhat shockingly, First Place argues that Otis did not suffer actual prejudice, because (1) Otis should have known that AE was attempting to take over elevator maintenance work at First Place Tower in 2024 and was preparing a report, and (2) Otis knew White did not prepare the Report long before White's deposition, because Otis has worked with White in the past and knew it was "completely improbable Mr. White would work outside of his traditional scope of business and prepare the [Report]." ECF No. 65 at 5-6 & n.2. At the hearing, First Place's counsel argued that, at minimum, Otis should have informed First Place about its pre-deposition conversation with White on July 3, 2026, as a measure to mitigate Otis' prejudice.

This argument is not well-taken and in no way supports First Place's attempt to avoid a dismissal sanction. First Place, not Otis, altered the Report, attached it to the Petition, produced the altered Report in discovery, and affirmatively misrepresented the Report's authorship in disclosures and two depositions, despite clear and readily available email evidence identifying the

22

true author as AE.  Otis ultimately brought the truth to light during litigation.  Even if Otis had suspicions about the Report's authorship, Otis was entitled to rely on First Place's representations and had no obligation to investigate whether First Place was being honest or producing false evidence.  Otis also had no obligation to share any such concerns, or its informal conversations with White, with First Place's counsel in advance of White's deposition.  Otis logically needed to obtain White's testimony under oath before accusing First Place of misrepresenting the Report's author.  First Place essentially argues that, even though its own counsel did not discover the truth from its client, Otis' counsel should have done so.  First Place's "blame the victim" approach only amplifies Otis' legitimate concern that First Place would take no responsibility for its actions going forward and continue misleading the Court.  Otis should not be expected to ferret out First Place's intentional misrepresentations to mitigate its prejudice.  *See Garcia*, 569 F.3d at 1180 (explaining that, when a party submits falsified evidence, "[t]he prejudiced party is forced either to attempt independent corroboration of each submission, at substantial expense of time and money, or to accept the real possibility that those discovery documents submitted by the opposing party are inaccurate").  This type of prejudice weighs in favor of dismissal.

### 3.     Litigation Strategy

Otis argues that, had it known from the outset that the Report was prepared by Otis' competitor, it may have entirely changed its litigation strategy.  This is because Otis asserts that First Place's claims of deficient elevator maintenance were merely a pretext for prematurely terminating their contract and seeking out a new contract with a competitor.  According to Otis, the fact that the Report was prepared by AE shortly before First Place terminated its contract with Otis demonstrates that First Place was already looking for a replacement elevator service provider,

even while under a multi-year contract with Otis.  Otis contends this strengthens its counterclaim that First Place breached the agreement.

The Court finds this to be a persuasive prejudice argument.  First Place gained an advantage in the litigation by concealing the fact it was prematurely considering bids from Otis' competitors when Otis formulated its theory of the case and conducted discovery.  If the Report appeared to originate from White, rather than a competitor, the Report not only would appear more legitimate in its findings but also would conceal First Place's communications with Otis' direct competitor prior to expiration of the contract.  It was entirely predictable, when First Place filed suit, that Otis would counterclaim for First Place's breach of contract based on improper termination.  Otis' full knowledge of the strength of its defenses and counterclaim could have altered negotiation and litigation strategies.  While the alteration is less severe than wholly fabricating a negative performance report, the Court finds the alteration relevant and significant to strategic decisions. Further, this type of prejudice is difficult to mitigate in the middle of litigation and weighs in favor of dismissal.  *See Archibeque*, 70 F.3d at 1174 (affirming finding that plaintiff's actions of concealing prior back pain and treatment in personal injury case, along with perjured statements, "irreparably prejudiced [defendant] in the preparation of its defense") (quotation marks omitted).

The Court finds the prejudice factor weighs in favor of dismissal, based on both Otis' inability to trust First Place's evidence and litigation conduct, and Otis' strategic disadvantage resulting from First Place's concealment of the Report's author.

### C.      Disruption of Judicial Process

First Place disrupted the judicial process in several ways.  First, First Place misled both Otis and the Court as to the Report's origin by filing the altered Report and misrepresenting in the Petition that it came from an independent third party rather than a competitor.  Second, because

24

First Place falsely stated in discovery and disclosures that White prepared the Report, an extension of scheduling deadlines became necessary to permit correction of the record, delaying trial and other deadlines. Third, because of First Place's misrepresentations surrounding the Report, Otis filed this Motion for Sanctions. The Court then had to strike all remaining deadlines in the case, including the trial date. This factor weighs in favor of dismissal. *See Garcia*, 569 F.3d at 1181 (explaining that, "when a party willfully submits false evidence, it imposes substantial burdens not only on the opposing party, but also on the judicial system itself, as the extent and relevance of the fabrication are investigated").

### D.    Warning of Dismissal as Sanction

The Court did not explicitly warn First Place of dismissal as a possible sanction for altering the Report or misrepresenting its authorship. However, this factor remains neutral, because "an explicit warning that dismissal would be a likely sanction for fabricating evidence . . . is not a prerequisite to the imposition of dismissal sanctions." *Garcia*, 569 F.3d at 1180. *See Archibeque*, 70 F.3d at 1175 (affirming dismissal as sanction for falsifying evidence even though plaintiff was not warned of imminent dismissal).

### E.    Efficacy of Lesser Sanctions

Dismissal with prejudice "is a severe sanction and is not ordinarily warranted if lesser sanctions would be effective." *King v. Fleming*, 899 F.3d 1140, 1153 (10th Cir. 2018) (quotation omitted). However, it is an appropriate sanction when the "evidence support[s] the need for an unforgiving sanction to deter future misconduct . . . and to issue a clear statement to potential imitators." *Id.* at 1153-54. *See Jones v. Thompson*, 996 F.2d 261, 266 (10th Cir. 1993) (explaining that "[d]ismissing a case with prejudice serves at least two purposes. It penalizes the party whose

conduct warrants the sanction and discourages those who might be tempted to such conduct in the absence of such a deterrent.") (quotation omitted).

The Court has carefully considered lesser sanctions for First Place's litigation conduct, including (1) excluding all versions of the Report from evidence; (2) permitting both versions of the Report into evidence and permitting cross-examination about the altered Report; and/or (3) payment of expenses incurred by Otis in conducting additional discovery related to the Report. The Court finds all lesser sanctions are insufficient.

First, exclusion of the Report from evidence is an insufficient sanction in this case because such exclusion ultimately benefits First Place. If the Report is excluded from evidence altogether, First Place will avoid being confronted with credibility issues surrounding the varying versions of the Report. At the same time, it will be permitted to present other evidence of Otis' alleged negligence, such as White's inspection reports. Simply excluding the Report, with no other consequences, sends a message that litigants "have everything to gain, and nothing to lose" by beneficially altering or manufacturing material evidence. *See Garcia*, 569 F.3d at 1180.

Second, allowing both versions of the Report into evidence, and permitting Otis to cross-examine First Place regarding the alterations of the Report, is also an insufficient sanction. Although it comes closer to effectuating a proportionate punishment, this sanction is insufficient because it would still permit the jury to view a report authored by Otis' competitor that criticizes its performance, despite First Place's pattern of bad-faith litigation conduct surrounding the Report. *See* ECF No. 80 at 24 (when questioned about whether allowing cross-examination about the altered evidence was a "pretty decent sanction," Otis' counsel persuasively argued that First Place would still "get the benefit of" a jury viewing a competitor's detailed criticism of Otis' performance). Further, this Court afforded First Place a full and fair hearing on the motion for

sanctions, and Otis met its burden of proving culpability by clear and convincing evidence. Permitting First Place an opportunity to present its own claims to a jury, while also affording First Place a second opportunity to prove its veracity surrounding the Report, is not a sufficient sanction for the bad-faith conduct found by the Court. *Cf. Walker v. Spina*, No. CIV 17-0991 JB/SCY, 2018 WL 6050630, at *21 (D.N.M. Nov. 19, 2018) (finding cross-examination of plaintiff about inconsistent evidence would effectively penalize plaintiff as a lesser sanction, where plaintiff had not clearly made misrepresentations, and the challenged statements related only to the extent of her injuries, not their validity).[14]

Finally, the Court finds a monetary sanction in the form of Otis' expenses caused by the misconduct to be insufficient. This will not have an adequate deterrent effect on First Place or other litigants. This factor weighs in favor of dismissal.

**F.    Summary of Analysis**

Pursuant to Rule 37(b)(2)(A) and the Court's inherent equitable powers, the Court concludes that First Place's claims against Otis shall be dismissed as a sanction for First Place's (1) intentional and willful alteration of the Report, which it attached to the Petition and produced in discovery; and (2) intentional and/or reckless misstatements and misattribution of the Report's authorship in litigation documents and deposition testimony. The Court finds all factors, except the warning of a dismissal sanction, weigh in favor of the extreme sanction of dismissal.

Honest mistakes occur during litigation, and such mistakes should not result in the severe sanction of dismissal. Here, the Court finds that the overall pattern of behavior by First Place related to the Report constitutes bad-faith, unreasonable litigation conduct that prejudiced Otis and

---

[14] First Place did not propose any type of jury instruction surrounding the Report that would allow the case to proceed and yet still impose an adequate sanction. The Court finds no such instruction sufficient in this case.

disrupted the litigation. First Place offered no credible or supported "good-faith" explanations for the original alteration or its subsequent litigation conduct. Although mindful of the admonition to resolve claims on the merits, the Court finds that no lesser sanctions are sufficient to cure Otis' prejudice, punish First Place, and deter similar misconduct.

The Tenth Circuit has repeatedly upheld a sanction of dismissal when a court found that a plaintiff willfully and intentionally fabricated evidence and/or withheld material information. *See Garcia*, 569 F.3d at 1180-82; *Archibeque*, 70 F.3d at 1174-75. As in *Garcia*, the submission of falsified evidence substantially prejudiced Otis by "casting doubt on the veracity of all of the culpable party's submissions throughout litigation." 569 F.3d at 1180.

### III.    Conclusion

Defendant Otis Elevator Company's Motion for Sanctions Under Federal Rule of Civil Procedure 37 (ECF No. 56) is **GRANTED**. First Place's claims against Otis are **DISMISSED WITH PREJUDICE** as a sanction pursuant to Federal Rule of Civil Procedure 37(b)(2)(A) and the Court's inherent equitable powers.

Because the Court dismisses First Place's claims with prejudice, Plaintiff's Motion for Partial Summary Judgment (ECF No. 37); and Defendant's Motion In Limine to Exclude Evidence of Plaintiff's Damages (ECF No. 52) are **DENIED AS MOOT**.

The parties are **ORDERED** to confer and submit a status report proposing a schedule governing the remainder of the case no later than three weeks from the date of this Order, or by May 8, 2026.

**SO ORDERED** this 17th day of April, 2026.

_____
**JODI F. JAYNE, MAGISTRATE JUDGE**
**UNITED STATES DISTRICT COURT**

28